Argument not to exceed 15 minutes per side. You may proceed for the appellant. Mr. McMurtry. Good afternoon, your honors. First, I'd like to state that I've reserved five minutes for rebuttal. And I'm ready when you are. Go for it. Thank you. Again, my name is Todd McMurtry. I'm here representing the House of Representatives. And I'm here representing the House of Representatives. The plaintiffs, Sam and Jill Johnson, who have joined us today in the courtroom. Present also with me are our counsel from Tennessee, Lindsay Smith, and my colleague, Will Huber. Will Huber, excuse me. He is humorous. But anyway, today we're here because the district court found that there were insufficient contacts for the Johnsons to call Kathy Griffin, who lives in California, into the Tennessee district court. And we believe that that was an error because we would suggest, as we pled in our complaint, that Ms. Griffin did create a substantial connection to Tennessee through her conduct involved in this incident. And I'm sure your honors have read the complaint. Nevertheless, it's a social media controversy created when a video... We know the facts. So the things specific to jurisdiction that are important are, one... What do you say about, you know, it's not just that we respect precedent. We tend to respect precedent involving the same party even more. So we have the Blessing case. What's your take on that? Well, I think that the Blessing case is different in that the defendant, Griffin, in that case, never contacted anyone in Kentucky. She did not tweet directly at someone in Kentucky. And if you look at the court's opinion... That's the key fact. In other words, that would be enough to give us personal jurisdiction. Give the court personal jurisdiction. I think you have to look at the totality of the circumstances and where the brunt of the injury was felt. And I think in this circumstance, it was felt in Tennessee. And as I was saying before, in the Blessing case, Ms. Griffin, the court stated that her position was that because she did not tweet at anybody in Tennessee, that she should not be called into court. Excuse me, in Kentucky. That she should not be called into court in Kentucky. That fact is different. But there are other facts that I think are also important to consider. Where would you draw the line? In other words, what should the test be that we should determine which way it goes? Well, I think that the tests that we have are sufficient if you look at them. For example, if you look at the Calder case, we have a circumstance there where there was a publication. I think it was the National Enquirer. The reporters from Florida called into California. There was substantial distribution of the newspaper in California. And they had conversations with people in California and knew that the greatest harm would fall upon the plaintiff, in that case, in California. And that's almost identical to our situation here. Well, we're in this social media age where it seems that everybody wants to tweet about something. And celebrities, of course, often have these huge bases of followers. So I guess with Kathy Griffin, maybe it's two million. And James Woods had some cases on the sort of conservative side with several million followers. And so the argument here, I guess, from the other side is really what Kathy Griffin was doing here is just speaking out on a matter of public concern. She says in the first tweet something to the effect, this guy wants to be online famous and, you know, let's be vigilant. And I guess on the other side, in terms of contact with, you know, Tennessee, the contact is, you know, fairly minimal. One would argue, maybe the other side would argue. There's the ad visuel and then there's the follow-up. And there's contact with the Johnson's directly or their mention. And then there's the follow-up about the Board of Directors. But it's largely an appeal to her, as one might argue, to her sort of nationwide, you know, base to just be vigilant. This is something a matter of public concern. How do you respond? Well, it's tortious speech. And so I don't think that when something is a matter of public concern, that it's necessarily not subject to tort, to an action in tort. I mean, there are many, many torts that involve speech. And many of those things could be matters of public concern at the same time. So I don't think that that should serve as a bar. And generally, when you think about something as a matter of public concern, that's a defense to a defamation claim. In other words, that's a defense to false speech. And we're not alleging. This is not a disguised defamation claim. That's what they claim. I mean, but just look at what she said. It's not necessarily defamatory. It's calling for Sam Johnson to be terminated from his job. I mean, a defamatory statement would be false. This is merely a declaration. But, Your Honor, to answer your point directly, you know, tortious interference could be speech on a matter of public concern, fraud, intentional infliction of emotional distress, invasion of privacy. I'm a little embarrassed I didn't take the time to figure this out. But in the cases cited by you on the other side, are there any that are employment cases where the, you know, it's internet, the tweet, or whatever the communication, you know, it goes lots of places. It's the internet after all. But it is, it does lead to an employment dispute. Are any of the cases have that feature to them? I'm not aware of any case that has that, that has facts that similar to our circumstance where somebody's been fired as a result of, you know, internet public speech that we could cite in this brief. Can I ask you a related question, although different, is if the corporation was based in Ohio, for example, would that make a difference? In other words, would the court then not have personal jurisdiction? Yes, I think it would make a difference because Tennessee would not be the focus of the activity that Ms. Griffin undertook. It would not be where she tweeted at the employer. It would not be where she tweeted at Mr. Geitman directly. It would not be where Sam Johnson was employed. It would not be where Jill Johnson was employed. I mean, when you, Your Honor, when you talk about, well, the contacts are somewhat minimal, they're not really minimal by the Calder standard. And they're not minimal when you think that all of it occurred just in a little space in Tennessee. So I think that there is a good argument that there was a significant effort by Ms. Griffin. What about this argument that there really didn't allege, you know, any, you know, real number of Tennessee readers? I mean, apparently Geitman's a reader and you say Viguel is a Tennessee reader, but there's not a large number. I mean, it's sort of a very, very small number. And there's no way to know, I guess. You weren't able to find out how many followers there are in Tennessee. I'll let Mr. Viguel tell me exactly when, but sometime after this event, her account went private and we were not able to look at that. And to be honest, I cannot recall if that was before we filed suit or after. But at some point it went private and as of today we could not determine that. But nevertheless, there are 2 million followers. Certainly a large number, and there's only 50 states and maybe some countries, but certainly a large number of those, including 2 of the people in this lawsuit directly interacted with her on Twitter. So I would agree that if we could point to 1,000 Tennessee residents who also followed her, that that might be helpful. But I think we can look at the effects of what happened to also suggest that Tennessee residents did learn about this. And I think that those facts, there's enough facts in the complaint to take from it that the Tennessee residents who followed Kathy. So the instance in D.C., not Kentucky, but it does have this 1 statement, and I'm paraphrasing, I don't remember the exact words, but it's to the effect of, you know, you need to let these kids know how to behave right. In other words, it's suggestive in the way, this was very direct going right to the company, and particularly the board, the end. But the blessing one is kind of suggestive of that, of saying, hey, these kids aren't doing what they're supposed to do, and you should be doing something about it. Why? Isn't that like this case? I mean, wouldn't you say that surely Covington High School saw that? I realize the trip was probably still going on at the time of those tweets, so they were still technically in D.C., the kids anyway. But would that have a similar targeting or not? Well, it's somewhat similar, but we have more. I mean, we have back and forth with the employer and Kathy Griffin online. Well, help me out with the rule. I know what you think, which is we have more, and more is enough to win, and all I want to do is win. Well, we're up here with the next case, and we're thinking we don't want to draw an arbitrary line where every day is a new day. So how would you reduce this to kind of a rule that, fine, your client wins under the rule, but it's a rule that isn't just, okay, there's one more little fact. It happened on a Tuesday. Well, I think that the Calder case and the Blessing case are similar in that they don't have a rule that says what the brunt of the injury or the focal point of the activity is. And I think in this circumstance, when a person on social media zeroes in on a focal point, be that a person and a state, and I think one of you asked if it was in Ohio, would that be a difference? It would be. But when you have all of these events coming together at one focal point where the brunt of the action is felt at that one spot, then I think that there's enough to say that you should exercise jurisdiction, or that the court should exercise jurisdiction when given an opportunity like this. And I think that this case is very distinguishable from Blessing and even Walden. In the Walden case, the person was in Nevada. Their money had been taken from them in Georgia. The only thing that occurred in Georgia was that they didn't get to enjoy their money, and that was not the focal point or where the brunt of the injury was felt. Here, looking at Blessing, Calder, and Walden, we can say that in this particular case and in others like it, when a social media person, I'm out of time, social media person tweets into a spot, then they have to be careful about how they do it. Thank you. Good afternoon. May it please the Court. My name is Mike Greigel with Greenberg Torg in Albany, New York. With me is Adam Siegler from my firm's Los Angeles office, who will work with me on the briefing. We represent the defendant, Apple E. Cathy Griffin. Your Honors, Plaintiff's claims against Ms. Griffin are predicated on three tweets addressing a matter of general public interest that formed no jurisdictionally relevant contacts with the State of Tennessee. Can I ask you, it seems to me the tweet concerned the Tennessee activities of a Tennessee resident. It impugned the professionalism of an executive whose career was centered in Tennessee, and the tweet was drawn from Tennessee sources. In the brunt of the harm in terms of professional reputation was suffered in Tennessee. Do you agree with all that? I do not, Your Honor. Okay, where do you disagree? Here's my point of departure. First of all, Ms. Griffin was not communicating with sources in Tennessee. This is a very... Well, they reached out to her and she said, let me know. I can't remember the exact nature of it, but they reached out to her and she said, let me know what you need. I'll help. In Plaintiff's briefing, Your Honor, below in this court, there are two points in which there's an allegation that Ms. Griffin communicated with two people in Tennessee, Mr. Geitman, who is one of the students involved in the underlying incident. However, that tweet is not at issue in this case. I understand, but you said that she didn't have contact with anyone. She had contact. So you agree it concerned Tennessee activities of a Tennessee citizen, correct? I agree with that, Your Honor. I do not think that is in any way remotely close to establishing a predicate for jurisdiction. Hold on, but you agree with that? I do. You agree that it impugned the professionalism of an executive who was based in Tennessee? Your Honor, I would characterize the statements at issue differently. I view them as Ms. Griffin expressing her opinion that Mr. Johnson deserved to be online famous. Now, people can agree with that. I thought she called him a derogatory, anti-gay type slur. Not as alleged in the complaint, Your Honor. There's only three tweets that are true. That's on the line, but can I just, I'm trying to, it's so hard to figure out what the red herrings and what's material. Let me try a theory here. I'll warn you, I don't think it helps you, but I do have a theory and I want you to tell me why it's wrong. I just think this is an employment case. I think the number of followers, zero relevance. It adds noise, but I think this is an employment case. There's a direct communication to the board at the end that's clearly about getting the board to fire him from the board, and it succeeds. And we have to assume it's an intentional tort, right? We're not allowed to get to the merits of the intentional tort in doing the specific jurisdiction. So as far as I'm concerned, it's an unfair analogy, but I'm just trying to be clear about it. It's as if someone wrote solely to the board, no one else. The board is in Tennessee and they said, do you know that your CEO is a child pornographer? We expect you to fire him by tomorrow. And they fire him. And that's a lie. I can't imagine a world in which there's not specific jurisdiction in Tennessee by that out-of-court statement. It's the same whether they wrote it in a letter, they came to the board physically and delivered that lie, or they did it in a tweet that one person saw or two million people saw. It makes no difference. So to me, tell me why I'm wrong about that way of thinking about it. Suitably forewarned, Chief Judge Sutton. I think there's two responses to your question. One is factual and one is legal. The factual one, and I think this is a point I really want to urge on the Court, the allegation in the briefing by the plaintiff before this panel is that there was a direct communication from Ms. Griffin to the Board of Visual. That is simply not... You're using the word direct to say it was effectively a CC. That's effectively what it was, agreed. So be it. You CC the board that the CEO is a child pornographer and you expect him fired. You would not say that case turns on the fact that it was in a CC line. I would not, Your Honor, but here, again, I think that this argument misconceives the functionality of Twitter and believe me, I'm over 60, so this was new to me as well, but it's a very different thing, an extraordinarily different proposition if Ms. Griffin had communicated directly in a conversation on social media or otherwise with Visual's board. She did not. She was communicating to her entire universe... I don't care. I mean, why does it inoculate your client that 8 million people see it rather than the decision maker? It's the decision maker and the 8 million. In terms of personal jurisdiction, Chief Judge Sutton, she hasn't stepped into the market the way the defendants in Calder v. Jones did, and the fact that there's a broad universe, this focuses on the harm in Walden v. Jones, and the fact that there's a broad universe in Walden and that the defendant has decided subsequent to Calder, and in my view, dramatically narrowed the scope of that holding... That is such an unusual case. It is, but so is Calder v. Jones, and the court made it plain that in Walden, that the fact that the harm was suffered in the jurisdiction where the plaintiff resides is insufficient to establish jurisdiction. Stick with my hypothetical. It's not these facts. Do you agree that if there's a tweet that just one person gets it, the decision-maker gets it, the decision-maker fires the person based on a lie in the tweet, we would agree that the person fired can sue where the employer, the decision-maker, was? That has to be the rule in an employment case. And if that's, I want to find out if you agree with that rule. I do not agree with that rule. Why? I don't understand how not. Because someone can say something broadly disseminated on the Internet, and the fact that the employer... You're changing the question. I'm asking you, why won't you concede a one-person... Let's call it a letter. People 60 and over understand letters. I'm in that category, too. It's a letter. It's a lie. It goes to the board and says, get this guy off the board. He's a child pornographer. Is that enough for specific jurisdiction in the state where the decision-maker is? I think it is. Now you've got to explain to us why it going to 2 million, as opposed to just one, helps you. That seems quite counterintuitive. I think the counterintuition is alleviated, Chief Judge Sutton, by this response. There is no question that the sender of the letter was going into Tennessee and reaching the board to communicate with someone in Tennessee. Miss Griffin was not. She wasn't communicating directly with the board, Chief Judge Sutton. She was communicating with 2 million people. Wait, if you send a letter, take Judge Sutton's hypothetical, and then you put the letter on Twitter, would that insulate you? If the letter had already been sent... What if you say, I'm sending this letter, put it on Twitter, and tag them, and then also happen to mail it? It's the physical mailing into the jurisdiction that changes the analysis in terms of personal information. What if you e-mail it? If you e-mail, then again, you are reaching out directly to the board of Visuel. Look what she does. She reposts the termination of it, and then she says, has he been removed, and I'm surmising, from his position on the board, and if not, what measures is Visuel taking in this regard? And they respond to that, terminated. Then they follow up again, terminated, confirmed. We've got some communication here. In those tweets, she wasn't doing the electronic equivalent of sending a letter to Visuel. She was talking to 2 million people at once. What if I send an e-mail and CC 2 million followers? Well, if there is an e-mail transmitted, a single e-mail, I'm not sure that provides a sufficient penetration of the jurisdiction. Why is the letter different in today's age? Because you're targeting Visuel. You're reaching into the jurisdiction. And when you're e-mailing. And so if I CC 2 million followers on my e-mail, does that change things? Because I want to show everyone my... If she e-mailed first to Visuel's board, she had the name of the board of directors, and e-mailed the same thing, different case, there may be a much colorable argument for jurisdiction. The fact that she transmits... She's not targeting, again, social media. It's the nature of the Internet. Now I'm trying to help you. And I think the only way this could make sense is that tagging is somehow not like CCing or not a direct communication. So try to go down that road. Because I don't think you're helping yourself so far. Try that. That's the point I'm trying to get at, Chief Judge Sutton. Why is that helpful? She's speaking broadly on social media to her entire group of followers. She's not targeting the communication in a meaningful way. If you tag them, you're sending two messages. You're saying, A, if you don't take this action, I want my following to bring you down, basically. And B, if you do take... When they did take the first action, she follows up with a direct communication. But she isn't speaking or communicating directly to the board. She's talking and commenting about what she thinks is the appropriate response by the board of directors of Visual. I think the way I'd put it, if I were in your shoes, is something like this. Her First Amendment activity is to convince two million people to go after this company. She can't do that if she, quote, doesn't tag. In other words, if she doesn't tell them how to communicate, they won't. And she wants something efficient, and so that's why she does it. But the trick is this isn't an intent test. The trick is that the only way to tag is to also directly communicate. And I will say, in this case, some of the communications, even if we were looking at intent, some of the communications are pretty direct. Is he fired yet? I think the same point could have been made in Blessing, Chief Judge Sutton, which is there she called for... Did she tag the school? She didn't. I don't believe she did tag the school. Never tags them, at least in the tweets in the case. But there's no question that she was calling for those students. And she mentioned the high school where they went to school, knowing that a large number of the plaintiffs in all likelihood attended there, resided in Kentucky. And this court found that that was insufficient. In fact, this court really gave that argument the back of its hand in the Blessing case. And it wasn't sufficient to establish the necessary level of personal contact with the jurisdiction in Blessing, and the same point should hold here. Isn't Blessing, isn't everything on due process dicta in Blessing? Under our court's precedent and right? Because it's not necessarily the outcome. The outcome was done by the time they got to due process. They even say in any event. My reading of Blessing, Judge Lepar, is that the court very carefully examined Calder v. Jones, which the plaintiff is trying to... I understand, but isn't that dicta? I don't think it is, because the panel decided that... Tell me, if they would have stopped before they got to the constitutional analysis, the outcome was still certain, right? There was no jurisdiction under Kentucky's long arm. Correct. And then they say in any event, there's also no personal jurisdiction. So it is dicta. It's not necessary to the outcome. But the due process jurisdictional analysis in Blessing certainly informs the position that's being taken by the plaintiffs in this case. And I think the same reason that a panel of this court rejected the argument under due process in Blessing applies wholesale to this case. The only... It's much different than Blessing in that what I read you when I was inserting Tennessee was from Calder. It's the first three sentences of... No, I understand your point, Judge Lepar, but our position is this. Is that Calder is a unique case in a lot of ways. The unique case we're bound by. I certainly understand that, Judge Lepar. And what mattered to the court in that case, or at least as clarified in Walden v. Fiore, is that the jurisdictional finding turned on a couple of things. First, that there were 600,000 print copies of the National Enquirer distributed in California. A product was in the border of California. Second, the reporters had reached out directly and contacted by telephone sources. Third, they spoke with Shirley Jones's husband and let him review a draft of the article. We have none of that here. Can I ask you what tweets in your mind would subject her... I just have one. What tweets by Ms. Griffin would subject her to the personal jurisdiction of a Tennessee court? Just tweets. Well, I don't think it can be defined based on the content of the tweet, no matter how objectionable. It has to be based on the purposeful direction of the message into Tennessee, not to a nationwide audience, which is what happened here. What if it's to both? Well, if it is to both, certainly there are some citizens in Tennessee that saw this, but that's not sufficient to establish jurisdiction because she wasn't directing the tweet into the jurisdiction of Tennessee. She did nothing here... Only to the employer. Well, we read that fact differently, Chief Judge Sutton. I don't think she was communicating directly with the employer. Again, if she had sent a letter to the board or an email to members of the board, different case, but we're not there. I wonder if you could just give me like maybe a 30 second answer. You argue in your briefs that we should decide this case under 12B6 really, that there has not been, there's been a failure to state a claim upon which relief can be granted. This is a disguised defamation claim in essence, even though it's brought as a tortious claim in that this is a matter of, well, I'll just leave it at that. Would you just address... Yes, Judge Cole, the point we're trying to make there is that the plaintiff can't do an end run around the traditional defenses and limitations under the First Amendment that apply to a defamation claim by pleading alternative theories of intentional tort as a basis for recovery. And simply because a defamation claim wasn't asserted here, there's no allegation that anything Ms. Griffin said on tort is false. They were expressions of opinion. They're non-verifiable. You can't avoid the architecture of the First Amendment that protects free speech and allows for capacious exchange of ideas online by asserting backdoor tort theories. Is there like one case, I think you cite some district court cases, but is there one case that you would really think supports that proposition? Two. The Supreme Court's decision in Hustler v. Falwell, and I know this decision I'm about to make in a case, Candace Griffin v. USA Today, where Candace Griffin was represented by Mr. McMurtry. I represented USA Today. We have the same intentional... Weren't those both public figure cases? Are you saying, is it Johnson who was a public figure? Those are public figure cases. Whether Mr. Johnson is a public figure under the limited purpose public figure doctrine, I don't think you need to get there to still hold that. And maybe he is, maybe he isn't. But you don't need there to recognize the established principle that the First Amendment can't be evaded by repackaging the theory of tort recovery. That's my point. So I hope I've answered your question. Thank you. Thank you, Mr. McMurtry. Looks like you have five minutes. Thank you. I'm ready. I'd like to quickly just address the final comment on whether or not Mr. Johnson is a public figure and whether that matters. I think it's important to note that, again, it's not a defamation case. The claims that Mr. Reigel was stating really arise as a defamation type defense. I assume you agree the First Amendment applies to intentional tort claims. We still have to deal with the First Amendment. You can't give the tort a new label and say First Amendment's gone. I don't think that because somebody speaks exercising their First Amendment rights and they speak on a public issue, if that speech constitutes a tort, I don't think that there's a defense necessarily because the First Amendment might apply to that conduct. I mean, in essence, defamation is just a way to put the brakes or the defenses provided in defamation are really just the way to put the brakes on false speech. It used to be that there was strict liability for defamatory claims, and we really don't have that here. And we did cite in our briefs that there are Tennessee cases that say that the First Amendment does not conflict with Tennessee's tortious interference law. So I don't think that just because something you can see that's not binding on us. But just because something is not a, because some statement is public and it's made about an event like this, it can still constitute a tort. And I guess that's our position. Judge Cole, I think primarily in response to your question. And Judge, the part of your point, you beat me to it by the tweet from Kathy Griffin, which is in our brief and does specifically tag Visuel, was in essence an email to Visuel with a cc to Kathy Griffin's 2 million followers. And I think that that is the best way to look at this. And Judge Sutton, when you were asking about what is the test for this, I take your point and agree with you that it is in essence an employment case involving an email carbon copy to 2 million people that created social uproar. Certainly not a matter of public concern. Mr. Johnson was having dinner with his son and his son's girlfriend in a restaurant in Tennessee, in Franklin, Tennessee. And he didn't ask to be made public. He didn't insert himself into any public controversy. He didn't do anything that would make him a public figure. He was a private individual. And as a private individual, he was entitled to some anonymity or not having his name spread all over the place in the manner that it was. So we would agree that it is a direct communication. It went specifically to at Visuel. It did interfere with his employment. That type of speech can be still actionable. Public speech, even on a matter of public concern, I think should still be able to constitute a tort and not be entitled to the defenses of a defamation claim. Defenses to defamation claims are not really designed to serve as a defense to public speech that is not defamatory. Again, we allege that this is tortious speech as opposed to defamatory speech. So I think that Mr. Greigel's argument really fails in that regard because we're not talking about defamation. And we would suggest that when the court looks... I'm just out of curiosity. You're spending your time on this, so now you've just piqued my curiosity. We don't have to address this. We could surely allow the district court to look at this in the first instance. But I'm just kind of curious how the tort works. So they said that you haven't alleged that anything she said was a lie. So how does the tort work? I'm not denying the possibility of a tort. I'm just kind of trying to figure out if it doesn't involve a lie, what is the tort? Well, it involves her retweeting to 2 million people. Okay, I'm not focused on jurisdiction. Keep going. Okay, but he's a homophobic POS in Tennessee who harasses a teenager wearing a dress to prom. Are you saying that's defamatory? It is defamatory, yes. And it is a repetition of a defamatory statement. But you're not going to get up there and say, he is a homophobe, right? Correct, no. So I guess you do think there's some lies. Well, I do. But our theory has been that the speech can still be... that speech, even protected by the First Amendment, can still constitute a tort. That's what we try to state in our briefs. But the tort really is that when you do this, when you send something to a board and you try to shame someone and then you copy that to your 2 million followers, that creates a kind of a cancellation event which leads to the board terminating you. And that's exactly what happened in this circumstance. So there was a termination. It was an employment law case. Are there many cases that have these torts? It does seem like a new phenomenon, sad to say. I have another one. It's still at the district court level. So it hasn't made it past that. We survived our jurisdictional motion on that one. That's quite a commentary on society. Thanks to both of you for excellent briefs and great arguments for answering our questions, which we always appreciate. It's a really interesting case and we'll do our best to get it right. So thank you. The case is submitted and the clerk may adjourn court.